UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK
4/28/2014

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

```
----------------------------X
                            :
ALLSTATE INSURANCE COMPANY, :
et al.,                     :      13-CV-5830 (JFB)(AKT)
             Plaintiff,     :
                            :      April 2, 2014
                            :
             V.             :      Central Islip, NY
                            :
DAVID ZELEFSKY, M.D., et al.,:
                            :
             Defendant.     :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          RICHARD KING, ESQ.
                            NATHAN TILDEN, ESQ.


For the Defendant:          E. CHRISTOPHER MURRAY, ESQ.
                            ANTHONY LICATESI, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

| | |
|---|---|
| 1 | THE CLERK:  Calling case 13-CV-5830, |
| 2 | Allstate v. Zelefsky. |
| 3 | Please state your appearance for the record. |
| 4 | MR. KING:  Good afternoon, your Honor. |
| 5 | Richard King on behalf of the plaintiffs, from the law |
| 6 | firm Smith & Brink, Garden City, New York. |
| 7 | MR. TILDEN:  Good afternoon, your Honor. |
| 8 | Nathan Tilden, also on behalf of Allstate. |
| 9 | MR. MURRAY:  E. Christopher Murray from |
| 10 | Ruskin Moscou Faltischek, on behalf of defendants Luz |
| 11 | Bazakos, Olga Gazonas, North Central Leasing and |
| 12 | Astoria Leasing. |
| 13 | MR. LICATESI:  Good afternoon, Judge. |
| 14 | Anthony Licatesi from Rubin & Licatesi.  I represent |
| 15 | Dr. David Zelefsky, New York Rehab, Pain Management & |
| 16 | Medical Services, P.C. |
| 17 | THE COURT:  Good afternoon, everybody.  As |
| 18 | you know, we're here for argument on the pending |
| 19 | motions to dismiss.  I have reviewed the papers, so you |
| 20 | don't have to start from scratch.  You can highlight |
| 21 | anything you'd like to highlight from your papers and I |
| 22 | may have some questions for you. |
| 23 | It's the defendants' motion, so I don't care |
| 24 | who goes first. |
| 25 | MR. MURRAY:  Good afternoon, your Honor. |

1          THE COURT:  Good afternoon.

2          MR. MURRAY:  Ruskin Moscou represents what

3     we've been calling the leasing defendants, which are

4     Luz Bazakos, Olga Gazonas, North Central Leasing

5     Company and Astoria Leasing Co.

6          The essence of the claim, the RICO claim

7     against the leasing defendants are that they were --

8     are principals or owners of New York Rehab, a medical

9     professional corporation, and by being so, there's a

10    violation of New York State law, a violation of New

11    York State's Business Corporation Law, and that the --

12    as a result, the sending of any invoices or demands for

13    payments to Allstate on no-fault claims are fraudulent.

14         In order for them -- Allstate to allege a

15    claim against the leasing defendants, they first must

16    at least allege sufficient facts that would demonstrate

17    that the leasing defendants are in fact undisclosed

18    principals or owners of the professional corporation.

19    Here, the complaint is woefully insufficient in

20    alleging sufficient facts that would raise a RICO claim

21    based on such an undisclosed ownership interest.  In

22    fact, the allegations of -- the few factual allegations

23    of the complaint cut against or refute any claim that

24    the leasing defendants are owners in the P.C.

25         The fundamental indices of ownership of an

1   entity is that the party shares the risk of loss or the

2   benefit of profits, that the risk is shared by the

3   party that's claimed to be an owner.  The allegations

4   here -- the only factual allegations against the

5   leasing defendants are that they entered into two

6   leases with the P.C. and that the price paid or the

7   rent paid under those leases was excessive.  There's no

8   allegation in the complaint that the amount of money

9   being paid to the leasing defendants was in any way,

10  shape or form dependent on the profitability of the

11  P.C.

12          There's $25,000 that was paid per month

13  under the two leases, which is alleged.  There's no

14  allegations whatsoever that that amount varied,

15  fluctuated in any way, shape or form, so that if the

16  P.C. made twenty million dollars one year, they still

17  received $25,000 a month under the lease payment.  If

18  the P.C. lost ten million dollars in one year, they

19  would still receive $25,000 a month under the lease.

20          There's no allegations in the complaint that

21  my clients shared in any of the risk of the profit or

22  loss of the P.C.  I think in and of itself, that

23  refutes any claim that they have an ownership interest.

24  This does not even go to the fact that they

25  misrepresent the terms of the lease in the complaint,

1   as opposed to what the lease actually provides.  But

2   even if we just ignore that and just took their

3   allegations, their allegations do not rise to the level

4   of showing an ownership interest because there's no

5   risk being borne by my client.

6          In addition, there are no allegations in the

7   complaint that my clients directed medical services,

8   made business decisions, engaged in any type of

9   decisions about what type of business they should be

10  in, what type of billing they should do, what type of

11  operations whatsoever, nothing whatsoever.  There are

12  vacuous, conclusory statements that my clients

13  "participated in the P.C.," but there are actually no

14  facts alleged that would support that allegation.

15         Under Iqbal and the Supreme Court's ruling

16  on a motion to dismiss, the complaint has to set forth

17  some facts which would, if proven, establish a

18  plausible claim.  Here, there's no facts alleged.  It's

19  just completely vacuous, other than the allegation that

20  they entered into two leases and the amount paid under

21  those leases was excessive.  That in and of itself does

22  not establish an undisclosed ownership interest or a

23  violation of the Business Corporation Law.  There's

24  just no there there with regard to the leasing

25  defendants.

1          The allegations in the complaint with regard

2     to the leasing defendants go through paragraph 79 of

3     the complaint.  Those allegations, most of them recite

4     statutory language and recite Monell, the case history.

5     Then when you go to the actual factual allegations

6     regarding the leasing defendants, it's just the plain

7     language and then the allegations regarding the two

8     leases.  That's it.

9          There's no request on behalf of the

10    plaintiffs to replead and there's been no showing that

11    they could plead additional facts.  So I think with

12    regard to the leasing defendants, the complaint is

13    insufficient to raise any claim that they're an owner

14    of the P.C. beyond what's called mere speculation.

15          THE COURT:  Let me ask you a couple

16    questions.  First, I understand obviously that sharing

17    in the risks would certainly be evidence of ownership,

18    of an undisclosed principal's ownership, but what case

19    says that even if there's other indicia of such control

20    or ownership, that that's dispositive, that if you're

21    not sharing in the risks, that you can't possibly be an

22    owner?  Which case stands for that proposition?

23          MR. MURRAY:  We cited a few cases where they

24    talk about that being the principle in our reply brief.

25          THE COURT:  Those cases -- I'll look at them

1    but do they say that that's required or that's --

2              MR. MURRAY:  It says it's the primary focus.

3    They don't say that -- they basically say that

4    ownership interest is someone that shares the profits

5    or the losses.

6              THE COURT:  They clearly allege -- there are

7    multiple paragraphs where they allege that they're

8    sharing in the profits.  They just don't allege that

9    they're sharing any losses, right?

10             MR. MURRAY:  They don't allege that they're

11   sharing the profits.  Actually, they don't.  They say

12   that they're funneling fees.  They don't have any facts

13   to support it.  Plus, they don't allege anything else.

14   Even if the sharing of the profits and the losses were

15   just one element of ownership or control and they could

16   allege other things, they don't allege anything else.

17   They don't allege anything whatsoever.  They just say

18   they participated and they're the owner, and they just

19   have these vacuous, conclusory statements.

20             They don't say the leasing defendants or a

21   particular one engaged in specific business decisions

22   or participated in the billing or provided services,

23   medical services to the P.C.  They don't do any of

24   that.  They don't give any substance whatsoever to

25   their allegations.  It's just this vacuous thing and

1    there's these two leases.

2            THE COURT:  On this issue of the leases, I

3    understand -- I'm going to ask them about this

4    discrepancy between what they alleged and what the

5    leases say.  But even accepting what the leases say, I

6    guess I don't understand how that issue could be

7    decided on a motion to dismiss.  How can you determine

8    without knowing -- just because there's a larger number

9    of pieces of equipment does not necessarily mean that

10   it couldn't have been excessive, right?  How is that

11   done on a motion to dismiss?

12           MR. MURRAY:  Because they have an obligation

13   to plead their case in order to -- to put specific

14   facts in it.

15           THE COURT:  They have.  They've pled that

16   it's excessive, right?

17           MR. MURRAY:  But they don't -- that's a

18   conclusory statement.  It's to say, okay, the $25,000 a

19   month is excessive.  That's not a fact.  That's a

20   conclusion.  If they wanted to say, this is the

21   equipment, this is what the market rate is, this is

22   what the lease is for -- if they wanted to actually

23   build up some facts around it to support their claim

24   that it's excessive, then they would be able -- they

25   should do that, but they don't.  They just say the

1  $25,000 is excessive.  That's not a fact, that's a

2  conclusion.

3          If you look at all their allegations in the

4  complaint, they're all conclusions, they're not facts.

5  There would be ways, if it was truly excessive -- they

6  would say, okay, look, there's this amount of equipment

7  that's being leased, here's fact that show that it's

8  excessive.  Then they say it's excessive.  Then they've

9  actually pled some facts to back up their claim.  But

10 they don't do that here.  They just say it's excessive.

11 It's a foregone conclusion.

12          And I think that's the problem with all

13 their allegations in the complaint.  They just come to

14 a conclusion without giving any allegations fact.  This

15 is a RICO action against two leasing companies that is

16 going to cost them large amounts of money to defend,

17 and just speculating that because they entered into

18 these two leases and we're saying it's excessive, we're

19 able to drag them into a RICO action based solely on

20 that, I think completely misses the mark -- is

21 insufficient.

22          It's not a heightened pleading requirement

23 but under Iqbal and other cases, there is a requirement

24 to come forward with facts, not conclusions, and they

25 don't allege facts.

1          THE COURT:  Okay.  Do you want to move to

2   your other points?

3          MR. MURRAY:  The requirement also with

4   regard to a distinctive enterprise under a RICO-pled

5   violation.  Here, the allegation that New York Rehab

6   was fraudulently incorporated and thus, that gives life

7   to this RICO claim.  In other words, the corporation,

8   the enterprise is the RICO violation.  The courts have

9   held that that's not a distinctive enterprise.  The

10  enterprise that's being alleged cannot be the RICO

11  violation.

12          The essence of the claim here is that the

13  existence of the corporation gives rise to the fraud.

14  So there's no distinctive enterprise which the

15  individuals are participating in, separate and apart

16  from the alleged RICO activity.  That's a pleading

17  deficiency.  You're not supposed to -- in order to have

18  a separate RICO enterprise, you have to have some

19  entity that's been taken over or being used to

20  perpetrate a fraud.  The existence of the entity itself

21  can't be the fraud, and that's what they allege here,

22  that the Monell violations -- the very existence of New

23  York Rehab is the fraud, so it's not a distinctive

24  enterprise in order to plead a RICO violation.

25          THE COURT:  Don't they allege all sorts of

1   mail fraud, though, independent of that?

2             MR. MURRAY:  Not with regard to our clients.

3             THE COURT:  Okay.

4             MR. MURRAY:  With regard to the leasing

5   defendants, there's no allegations that they

6   participated -- again, they just lump all the

7   defendants together but there's no allegation that our

8   clients participated in any kind of mail fraud, in the

9   sense of billing for services that weren't provided or

10  mislabeling services or miscoding services.  There's

11  nothing in the complaint with regard to the leasing

12  defendants that we participated or were involved in

13  that.

14            Everything with regard to the leasing

15  defendants goes to the Monell violation, the fraudulent

16  incorporation of New York Rehab.  They don't allege

17  sufficient facts to support that claim.  If they have

18  additional facts they want to allege, then they should

19  ask to replead and allege those facts in a complaint.

20            I think it's telling that in their

21  memorandum of law in opposition to the motion to

22  dismiss, they start to throw up anything, and half of

23  what they threw up isn't contained in the complaint.

24  They make allegations about them living together,

25  things that they just kind of throw in there because

1   all that's here, all that's in the complaint is the two

2   leases and a conclusory statement that the rent paid

3   under those leases is excessive.

4          And based on that, they want to drag these

5   four defendants into a RICO action and require them to

6   expend tremendous amounts of money defending it based

7   on a sole allegation of those two leases and according

8   to them, the conclusory statement that those rental

9   payments are excessive.  It's just not sufficient to

10  allege a RICO claim against my clients.

11         THE COURT:  Okay, thank you.

12         Okay, you guys are up.  Oh, I'm sorry, I

13  forgot.  Go ahead.

14         MR. LICATESI:  Thank you, Judge.

15         Your Honor, I stand before this Court today

16  playing the role of David versus Goliath.  In order to

17  properly analyze the instant action, I believe it's

18  important to examine the legislative intent of New

19  York's no-fault laws.

20         In the 1970's, in an effort to unclog and

21  unburden our system of these less than serious injuries

22  involving automobile accidents and in order to appease

23  auto insurance lobbyists, our legislature enacted

24  Section 5102 of the New York State Insurance Law,

25  wherein an automobile accident victim could not sue

1    unless he or she sustained a serious injury, which they

2    define as death, dismemberment, fractures, scarring or

3    some sort of permanent partial disability.

4            The reason I bring this up is, in exchange

5    for this law, your Honor, the no-fault laws were

6    passed.  The consumer advocates were up in arms and

7    they said, if we lose our fundamental right to sue in a

8    car accident case to unclog this system, which is an

9    extreme benefit to the insurance companies at the time,

10   what do the consumers get back?

11           And what the consumers and the assignees,

12   the healthcare providers received was reimbursement of

13   all reasonable and necessary healthcare claims as well

14   as lost wages.  The consumer advocates again were up in

15   arms saying, wait a minute, we're dealing with

16   insurance companies.  They're not going to pay.  They

17   put teeth into that law and they put a very specific

18   scheme, a regulatory way to get paid and very stiff

19   penalties to the insurance companies for not paying.

20           You're supposed to pay those claims within

21   thirty days.  The statute says not to take an

22   adversarial position.  The statute says to cooperate.

23   The statute says that the insurance company should pick

24   up the telephone and clarify any disputes.  It says

25   that if they don't do that, that the penalties are 2% a

1  month plus legal fees for not properly paying those

2  claims.

3         As expected, there was a drastic reduction

4  in the amount of less than serious injury cases that

5  were filed.  However, the insurance companies did not

6  anticipate the volume of the no-fault claims and the

7  amount of money the no-fault insurance carriers would

8  expend on the payment of those no-fault claims.

9         The volume of no-fault claims placed into

10  arbitration and civil litigation have increased each

11  and every year since the passage of the no-fault laws

12  and the enactment of the no-fault statutory and

13  regulatory scheme.  As a result, the automobile

14  insurance carriers were faced with increased

15  expenditures and began paying more in no-fault claims

16  than the previous bodily injury claims for less than

17  serious injuries.

18         Hence, the insurance carriers have

19  retaliated through a policy of claim avoidance and the

20  increased filings of what's before this Court today,

21  these RICO and Malella (ph) type of allegations.

22  Paragraphs 36 through 44 of the Allstate complaint

23  recite some of these applicable licensing statute and

24  no-fault statutes.  Additionally Allstate relies on the

25  Malella case, alleging that it does not have to pay no-

1   fault claim when there is a fraudulent incorporation

2   and operation and control of the medical P.C.

3           More specifically, Allstate argues by merely

4   pleading facts, that it may be plausible that the lease

5   rental agreements funneled money to Doctors Bazakos and

6   Gazonas and that the excessive lease payments funneled

7   profits from the professional corporation to North

8   Central Leasing and Astoria Leasing.

9           Judge, I heard the questions and the feeling

10   that I received is that the Court may believe that

11   that's enough.  But if you look at that pleading and

12   you look at the facts, the first fact that jumps out is

13   that there's a monthly payment of $3,700, paid from

14   North Central -- paid to North Central by New York

15   Rehab.  The second fact is that there's a monthly

16   payment of $21,500 to Astoria Leasing by New York

17   Rehab.

18           But what's not a fact is paragraph 72, and

19   we're bound by their pleading.  Paragraph 72 of the

20   complaint intentionally misrepresents to this Court

21   that in exchange for monthly payments of $21,500,

22   Astoria Leasing provided one office chair, telephones,

23   three computers, two printers, basic computer software,

24   five air conditioners, filing cabinets, a coffee

25   machine, basic office furniture, a vacuum cleaner, a

```
1    refrigerator and several medical devices.  Nothing
2    could be further from the truth.
3            And what's telling about that -- this
4    unsubstantiated allegation based on an intentional
5    mischaracterization summarizing the lease agreement is
6    a crystal clear indication of Allstate's deficient
7    pleading, which must be dismissed by this Court.  There
8    is also clear and convincing evidence of Allstate's
9    true intentions, which is to abuse the federal courts
10   by using a purported RICO and Malella claim as an
11   economic sworn to economically cripple and eventually
12   bankrupt my clients.
13           The facts of the Malella case established
14   that it was multiple professional corporations, truly a
15   doc in the box.  Dr. Cohen had two dozen professional
16   corporations that he rented his license to.  He had no
17   medical practice whatsoever, didn't engage in the
18   practice of medicine or the medical control and
19   operation of those practices.
20           In the instant case, Dr. Zelefsky is the
21   sole shareholder of New York Rehab, as admitted by
22   Allstate.  He works five days a week at both locations.
23   Allstate does not allege that Dr. Zelefsky is a doc in
24   the box.  Allstate does not specifically allege the
25   facts that either Dr. Bazakos or Dr. Gazonas control
```

1    the medical practice.  Allstate does not specifically

2    allege the facts that either Dr. Gazonas or Dr. Bazakos

3    operate the medical practice.  Allstate does not

4    specifically allege facts that either Dr. Bazakos or

5    Dr. Gazonas fraudulently incorporated this medical

6    practice.  Allstate does not specifically allege facts

7    that Dr. Bazakos or Dr. Gazonas financially invested in

8    the medical practice.  Allstate does not allege the

9    existence of a management company.  Allstate does not

10   allege the existence of a marketing company.

11            Which brings me back full circle to the

12   beginning of my argument, your Honor.  Allstate is

13   mischaracterizing two lease agreements as the only

14   means of support for this RICO action.

15            The New York Court of Appeals specifically

16   admonished against such conduct by no-fault insurance

17   carriers, by stating in pertinent part in that holding,

18   "The regulatory scheme [referring to the no-fault

19   scheme], however, does not permit abuse of the truth-

20   seeking opportunity that 11 NYC RR 65-3.16(a)(12)

21   authorizes.  Indeed, the superintendent's regulations

22   themselves provide for agency oversight of carriers and

23   demand that carriers delay the payment of claims to

24   pursue investigations solely for good cause.  In the

25   licensing context, carriers will be unable to show good

1  cause unless they can demonstrate behavior tantamount

2  to fraud."  This pleading is completely deficient of

3  any fraudulent allegations.

4        The Court should also be advised of how

5  Allstate came into possession of the lease agreements.

6  I voluntarily provided them these lease agreements.  I

7  had voluntarily provided the lease agreements to other

8  major insurance carriers, none of which have taken any

9  action against Dr. Zelefsky or NY Rehab.

10        Secondly and more importantly, Judge, I

11  learned this early on in my career.  It's what you

12  don't see that sometimes it the most telling.  What

13  these plaintiffs did not provide was a copy of the

14  lease agreement.  They did not provide or annex the

15  lease agreements with the fair market opinions from a

16  prominent forensic expert certified as a public

17  accountant and an expert in the healthcare field to

18  this lawsuit.

19        Why were they hiding this?  Why did this

20  mischaracterize what's in the lease.  Please look

21  carefully at how badly Allstate mischaracterized the

22  lease.  The Court will see that the equipment includes

23  at least 50 computers and corresponding licenses, 10

24  hard drive, 22 printers, 17 copiers, 8 blood pressure

25  machines, 21 physical therapy tables, 18 lockers, 13

```
1    curtain bays, over 40 items of medical equipment,

2    including fluoroscopy machines, EEG, VNG machines,

3    neurodiagnostic and range of motion equipment,

4    electrical stimulation and physical therapy machines

5    and numerous muscle strengthening apparatuses, as well

6    as spinal traction devices.

7              Your Honor, I have with me color photos of

8    the lease items that I would like to show the Judge

9    that this is what the lease calls for and it was

10   completely misrepresented to the Court.

11             THE COURT:  That's not something I can

12   consider on a motion to dismiss.  I can consider a

13   lease agreement because it's referenced in the

14   complaint but in terms of photos, that would not be a

15   motion to dismiss type -- that's evidence.

16             MR. LICATESI:  I don't disagree, Judge,

17   except that these are pictures of what's in the lease.

18             THE COURT:  I know.

19             MR. LICATESI:  And it's even further proof

20   of just the mischaracterization of what's truly going

21   on there.

22             The problem I have with the case, your

23   Honor, is that we're not going to try this case.  I'll

24   be here and I will try the case.  They're not going to

25   try the case.  The problem is, they use this to hurt
```

```
 1   those healthcare providers that are out there providing

 2   services to auto accident victims.  One out of ten of

 3   the healthcare providers don't accept the no-fault

 4   assignment because they don't know how to navigate the

 5   waters.  And when you get into the ocean, they make it

 6   very, very difficult to get paid.

 7             Then if you are somewhat successful at it,

 8   like Dr. Zelefsky's Queens practice has 80 people,

 9   they're withholding five million dollars from him and

10   saying that he's funneling money from lease agreements

11   that are reasonable, fair-market value and include a

12   forensic expert who said, this is the fair-market value

13   for it.  They haven't brought anything forward to say

14   it's not, and their entire complaint is based on that.

15             THE COURT:  Okay.  All right, thank you.

16             MR. LICATESI:  Judge, I know we're not going

17   to address the motion for the injunction right now, the

18   preliminary injunction.  We'll hear about that after

19   this?

20             THE COURT:  Yes.

21             MR. LICATESI:  Okay.

22             MR. KING:  Thank you, your Honor.  A couple

23   of I guess preliminary comments to both the arguments.

24   I'll try to go -- I think I'll go in order.  Maybe it's

25   easier for the Court.
```

1          With respect to an amendment, we're under no

2    obligation to request an amendment, although my client

3    does intend to seek leave to amend in light of newly

4    developed information and evidence that's come to light

5    since the filing of the complaint.  I think that the

6    discussion about amendment is premature.  Also, I would

7    note that I think the Court's order that was agreed to

8    by the parties is that amendments are due by April 14th,

9    so I'll leave that aside.

10          Let me start with the leasing defendants.  I

11   think the Court accurately stated the sort of

12   procedural posture of the case being a 12(b)(6).  The

13   allegations in the complaint that the four defendants

14   conspired together to do two things, essentially:

15   number one, to concoct this medical facility that was

16   controlled and there was fee splitting.  I think that's

17   the operative term of art in the Eastern District, fee

18   splitting, with non-licensed professionals.

19          And I think more ink was spilled on this

20   section of the complaint than the other:  That these

21   four defendants conspired to bilk my client out of

22   millions of dollars through phony medical testing,

23   unnecessary medical testing and the like.  I would note

24   I think for the record of this hearing that as we point

25   out in our papers, there's been not one statement made

1    in defense of any of the defendants that the medical

2    fraud portion of the complaint should be dismissed.

3            Just as a housekeeping matter, it would seem

4    to me that if that portion of the complaint exists as

5    to both sets of defendants, then at this procedural

6    posture, it would make no sense to dismiss the Malella

7    or the corporate practice of medicine count.

8            However, as the Court noted at the outset,

9    given where we are, the allegations that they got

10   together and put Zelefsky in a position where he's the

11   sort of face person of this medical entity, and

12   meanwhile, the person whom Mr. Licatesi refers to as

13   Doctors Bazakos, which I don't believe they are doctors

14   or we wouldn't maybe be here, but the Bazakos's would

15   share in the proceeds of that establishment against New

16   York law.  It's a creature of New York law.

17           Interestingly, I think, and this does touch

18   a little bit on the issue of the amendment -- as the

19   Court knows, there's been a stay of party discovery in

20   this case but third party discovery has been ongoing.

21   Just on a telephone call the other day with my brothers

22   here, one of the defense counsel alerted me to the fact

23   that one of the subpoenas returned that we had issued

24   to a third party, I think it's American Express, which

25   showed that New York Rehab had paid American Express

1   accounts to the tune of 2.3 million dollars over the

2   last seven years, somewhere in the neighborhood of

3   $500,000 of which apparently was to the personal Amex

4   account of one of the non-licensed so-called leasing

5   defendants.

6           In addition, your Honor -- that's just one

7   indication of where we see the money being funneled off

8   now that the subpoena search has started.  I think in

9   addition, as we filed in our -- as an exhibit to the

10  affidavit in support of the motion for an injunction,

11  it shows that the woman Bazakos, the leasing defendant

12  female -- I don't know if it's a wife or a cousin --

13  held herself out as the healthcare administrator for

14  New York Rehab.  This is not an arms-length operation

15  at all.

16          Another thing, and this was something that

17  we've known for some time, and I want to talk about

18  Corothers in a minute.  It's interesting -- I think

19  there's been an argument advanced by Mr. Licatesi that

20  the leases are reasonable and if my client is billing

21  to the tune of some tens of millions of dollars a

22  month, that's a little bit of money.

23          But it's interesting that when we researched

24  the defendants, the doctor in this case, the talent if

25  you will -- and New York wants to make sure that the

1    talent is in control -- resides in a $600,000 house,

2    while these poor folks that are the leasing defendants,

3    they reside in a three-million-dollar house.  That's

4    not in the complaint.  It may well be in the amended

5    complaint.

6           But I think the key here is, what we've

7    alleged has been sufficient in every case, every

8    similar case, some of which I've been involved in and

9    I'll talk about later with respect to the injunctions,

10   in the Eastern District and the Southern District as

11   far as I know -- I know of no cases where it's

12   insufficient.

13          Really, what I think my brothers have here

14   today, and I think the Court has alluded to this -- it

15   sounds to me like they have a pretty good counsel who

16   are going to make an argument that they have good

17   defenses to the cognizable claims alleged in the

18   complaint.  That remains to be seen.  But the arguments

19   advanced have been factual in nature.  So with respect

20   to the first, the Malella, I think that the rhetoric in

21   our papers, as the Court says, you're familiar with the

22   papers and has noted at this stage that stands.

23          Briefly, with respect to the distinctiveness

24   argument that was sort of tail-ended by Mr. Murray, he

25   makes two arguments in his papers, I believe.  The

1   first one is -- the both non-starters.  The first one,

2   as I think the Court noted -- New York Rehab is listed

3   as the enterprise, which I believe is in Count 1.  I

4   don't have the complaint in front of me.  New York

5   Rehab isn't identified as a defendant in that count.

6          I haven't seen a case across the country,

7   where I practice in many jurisdictions, where the isn't

8   sufficient to achieve distinctiveness.  The fact that

9   we plead in the alternative that in other counts, other

10  enterprises have been infiltrated, and New York Rehab

11  was a defendant in those other counts, doesn't negate

12  the validity and the cognizable -- the fact that Count

13  1 is cognizable.

14         The second distinctiveness argument I think

15  is a red herring.  I think the argument goes like this:

16  Allstate says that we're illegally incorporated.  So if

17  we're illegally incorporated, then we are what the

18  wrongdoing is.  But every court that's look at this --

19  and I think -- I was counsel in the Lyons (ph) case,

20  which is cited prominently in these briefs.  That

21  argument was discounted because we're talking about

22  illegally incorporated vis a vis what?  One piece of

23  the medical pie, which is the no-fault realm.

24         It has nothing to do with whether -- if Dr.

25  Zelefsky wants to share his practice with some folks,

1    the Bazakos's, and they want to treat people with other

2    insurance or with no insurance, cash payment, of

3    course, they're allowed to do this.  This is a creature

4    of the Malella case and then the regulations coming out

5    of that.  So both of those distinctiveness arguments

6    are -- I think they're meritless.

7              On to my brother, Mr. Licatesi.  It's funny

8    because I've never been called Goliath.  I think I'm

9    5'6'' with my heels on, so I take that as a compliment.

10             I would note, just to take these things

11   seriatim, as they came up in the discussion, it's

12   interesting to me that first we have sort of a history

13   lesson of no-fault, which I guess is -- if this was a

14   congressional hearing, that would have been important.

15   But it has nothing to do with whether the allegations

16   are sufficient under 12(b)(6).

17             All the arguments that were advanced on

18   behalf of Dr. Zelefsky by Mr. Licatesi were factual

19   arguments.  The value of the chairs, the value of the

20   computer, et cetera.  This Court isn't in a position to

21   even ascertain or to entertain such arguments at this

22   procedural posture.  Certainly after discovery or maybe

23   even in advance of discovery at a Rule 56 motion, that

24   would be a different story perhaps.

25             THE COURT:  Let me just ask you to address

```
 1  two parts of that, though.

 2                  MR. KING:  Sure.

 3                  THE COURT:  One is this distinction between

 4  what you alleged in the complaint versus what the lease

 5  says.  Do you have an explanation for why your

 6  allegations are different than what the lease actually

 7  says?

 8                  MR. KING:  I don't believe that our

 9  allegations are any different.

10                  THE COURT:  You allege, for example, that

11  there was one computer.  I don't have the lease in

12  front of me but they're saying there were 20 printers.

13  You know, you have specific numbers of computers and

14  printers and their lease has much higher numbers for

15  those types of items.

16                  MR. KING:  I have not seen the addendum or

17  whatever Mr. Licatesi is discussing with respect to

18  those leasing agreements.  So I can't speak to that,

19  other than to say that the information was provided to

20  us at some early stage by Mr. Licatesi or by -- I don't

21  remember, it may have been Mr. Murray because

22  originally, there was one attorney associated with the

23  case.  I apologize, your Honor, I don't have an answer

24  for that.

25                  THE COURT:  What are you saying?  I'm
```

1    talking about the information in the complaint.  That

2    was not based on the lease, that was based on something

3    else?

4              MR. KING:  No, I'm saying that the

5    information that was supplied -- we're calling them the

6    leases -- were supplied by one of these attorneys at

7    some point, and that information is what made its way

8    into the complaint.  In terms of these other -- if Mr.

9    Licatesi or anyone has additional documents that show

10   some different number, then I have not seen them.

11             THE COURT:  He's saying the leases

12   themselves show different numbers.  Isn't that what

13   he's saying?

14             MR. LICATESI:  He based the complaint on the

15   lease that's in his possession, that was provided to

16   him.

17             THE COURT:  Which has different numbers.

18             MR. MURRAY:  They're also exhibits to the

19   motion.

20             THE COURT:  Right.

21             MR. KING:  Annexed, your Honor.

22             THE COURT:  That's what I'm confused about.

23   They're saying -- it's Exhibit 1.  I guess A, right?

24             MR. KING:  I'm sorry, is this 1 to the

25   motion to dismiss?

1          THE COURT:  The notice of motion, yeah.

2    They have the rider to the lease agreement that has

3    particular items and equipment.  That's what's

4    confusing me.  If you're saying, we based this one the

5    leases they gave us, they're saying, these are the

6    leases and those numbers are completely different than

7    the complaint.

8          MR. KING:  Your Honor, I don't have the -- I

9    only have their motion papers here.  I don't have the

10   exhibit.  As I stand here today, I don't know what the

11   discrepancy is between the two.  I can't advise the

12   Court.

13         What I would say as a matter of 12(b)(6)

14   argument, though, is the following:  Assuming that the

15   riders were provided to my team as we put together this

16   complaint, assuming that that's true, I don't think it

17   changes the analysis of the Court in terms of, the

18   pleading is taken in the light most favorable to my

19   client, and we've stated that those --

20         THE COURT:  I know, but if you -- for

21   example, if your allegation is there's one computer and

22   they paid $20,000 a month for one computer --

23         MR. KING:  I agree, your Honor.  I

24   understand.

25         THE COURT:  -- it's different than when they

1  say that if -- when you're not in that sort of absurd

2  category of cases where it's sort of plausible -- just

3  the inference itself makes it plausible because there's

4  such little equipment on its face.

5           But they're saying if in fact the lease has

6  all this equipment, then at a minimum, to state a

7  plausible allegation, you should have someone -- I

8  guess you should allege that the fair-market value of

9  that equipment is much -- the fair-market rental, I

10 guess, of that type of equipment is much less than what

11 they arranged here.  Why shouldn't you at least have to

12 allege that, as opposed to just saying it's excessive

13 at the motion to dismiss stage?  Do you understand my

14 question?

15           MR. KING:  Well --

16           THE COURT:  In other words --

17           MR. KING:  I understand your question.

18 Would it be better --

19           THE COURT:  Your interpretation I guess of

20 Iqbal would be that anyone that has a lease agreement,

21 if you say they're an undisclosed principal because

22 those lease agreements are excessive, that that gets

23 you past the stage -- that's not a very high bar.

24 Anybody could say that.

25           MR. KING:  Right.

```
1              THE COURT:  If you alleged that somehow
2    there's been an analysis of the value and it's
3    excessive compared to what the lease says versus that,
4    that would be more, obviously.
5              MR. KING:  Your Honor, I obviously don't
6    disagree with that.  I think it would be better pled if
7    that were the case, and certainly that will be
8    something that we'll take the Court's guidance on and
9    address in the amended complaint.
10             I want to be clear about this.  With respect
11   to the discrepancies in the numbers, I don't want the
12   Court to take away from this hearing that I or my
13   partner have tried to mislead the Court.  We've already
14   been called misrepresenters, which I guess is fair,
15   since we've alleged that their clients are fraudulent
16   actors.
17             Does the Court -- I only ask this -- I don't
18   have this rider that Mr. Licatesi is talking about.
19   Are the numbers in that?  Then maybe it would be easier
20   for me to speak to that.
21             THE COURT:  I don't know if the numbers --
22   it's a long rider.  I think they counted them up,
23   right?
24             MR. LICATESI:  Yeah.  It's attached to the
25   lease.  It's a schedule attached to the lease.
```

```
 1              THE COURT:  Right, but there's not an actual
 2   number.  You have to physically count them, right?
 3              MR. LICATESI:  Right.  They spell it out.
 4   There's like four or five pages of --
 5              THE COURT:  You want to give that to him so
 6   he can look at it?
 7              MR. LICATESI:  Schedule 1.
 8              THE COURT:  Let me just ask you, because
 9   you're talking about amending the complaint.  What
10   would you be amending to add, the thing about the
11   American Express --
12              MR. KING:  I just used the American Express
13   as an example, which I think is a fairly large example,
14   because I don't know the last time that the federal
15   government paid your Honor's American Express or Visa
16   bill.  Certainly, my firm doesn't pay that for me.
17              The whole idea here, your Honor, really is -
18   - this case law has developed fairly rapidly in the
19   last say decade really, in the Eastern District and
20   Southern District.  Under the Corothers case, which is
21   the case -- no one has mentioned it.  Malella was sort
22   of the first.  The Corothers case says, look at the
23   totality of the circumstances.
24              As your Honor pointed out earlier, the fact
25   that there's profit and loss, that's some indicia of
```

1    control, some indicia of control.  It's a factual

2    analysis to get to the heart of control oftentimes, and

3    I think that what we se in the bank accounts bears out

4    the idea that this wasn't an arms-length agreement

5    where the talent, i.e. Dr. Zelefsky, hires a couple

6    folks that have some office equipment, and querying

7    whether that would be even a smart business move

8    anyway.  Why would you rent at $25,000 a month a bunch

9    of computers in this day and age.

10           But be that as it may, maybe they're friends

11   of yours, you want to help them out.  But the fact of

12   the matter is, this is not a relationship of the doctor

13   doing his thing and these folks that are just arms-

14   length.  The woman holds herself out as the healthcare

15   administrator of the medical facility.  This is not a

16   leasing -- this is not a woman in a leasing department.

17   That will be in our amended complaint.

18           All of the other financial -- what I would

19   call deceitful financial arrangements which all these

20   cases boil down to will be in the amended complaint to

21   show that it's the lease agreements but it's all these

22   other things, too.  It's interesting because Mr. Murray

23   says that his clients, they provide the medical

24   equipment, the NCV equipment.  And to hear him talk

25   about this equipment, you'd think this is a hell of a

1  bargain.  I want to look at the pictures.

2           But the fact of the matter is, now that

3  we're getting the subpoenas back, we see tens of

4  thousands and hundreds of thousands of dollars going

5  out the door from New York Rehab to who?  Medical

6  leasing companies for electrodiagnostic testing

7  equipment, which is the NCV/EMG testing equipment.

8  Query why New York Rehab would have to expend all this

9  money, significant money on that, if they were actually

10  being provided by these folks.

11          I think that these cases really -- it's like

12  peeling back to the onion.  At this stage, we've

13  established a cognizable claim vis a vis the Malella

14  claims.  I don't think your Honor wants to hear

15  anything about the medical fraud claims.  I'm happy to

16  talk about those but it doesn't seem like there's much

17  in the way of a defense there, so I won't take up any

18  more of the Court's time, other than to say we've

19  clearly alleged that the four defendants conspired to

20  produce what?  Medical invoices which misrepresented

21  the legitimacy of the entity, i.e. Malella and sought

22  payment on bogus medical treatment.

23          Of course we say that because we think

24  Bazakos is really in control, right?  They're the ones

25  living in the three-million-dollar house.  So my

1    amendment would go to -- as your Honor said, it would

2    be helpful to have an analysis done of what the real

3    value of the equipment in this rider is in the

4    marketplace.  I suppose -- I'm not stupid, I will

5    provide it.

6              But it will also strengthen, I think, and

7    further enlighten this Court to the fact that the money

8    that was being paid in by the insurance companies, by

9    my client and other insurance companies was being sent

10   back out of the New York Rehab bank accounts to other

11   people that you have to question why that would be,

12   including, I think as Mr. Murray told me on the phone

13   the other day, the personal American Express account of

14   Ms. Bazakos.

15             THE COURT:  Okay.  Do you want to address

16   the injunction issue now?

17             MR. KING:  Sure.

18             MR. LICATESI:  Your Honor, before we get to

19   that, could I just reply to a couple of those

20   statements that were made?

21             THE COURT:  I was going to let you then

22   reply and then address the injunction issue at the same

23   time.

24             MR. LICATESI:  Okay.

25             THE COURT:  Okay?

1            MR. LICATESI:  Thank you, Judge.

2            THE COURT:  Go ahead.

3            MR. KING:  Thank you, your Honor.

4            This request for an injunction is really on

5   all fours with a similar request that was made to this

6   Court last year in a case that I was co-counsel on, the

7   Elsinati (ph) case, which is prominently cited and

8   discussed in our papers as well as opposition papers.

9   The facts in that case are substantially similar.

10           Although that case had been pending for some

11  additional period of time, much of that time, there had

12  been no activity in the case, and my client moved to

13  have a standstill, if you will, with respect to the

14  arbitration, for the exact same reason that we're

15  asking for it in this case, which is it costs my client

16  money in terms of -- well, if it loses at arbitration,

17  it costs it money just in terms of transactional costs

18  every day, every time it gets in arbitration, as I

19  think most insurance companies in New York with respect

20  to say no-fault litigation and no-fault arbitration,

21  most of these companies pay their law firms that handle

22  that.

23           THE COURT:  I know but money -- as you know,

24  money is usually not a reason to grant an injunction.

25  If there's money damages, that can usually be handled

1   through a lawsuit, right?

2        MR. KING:  That's the standard.  We're

3   knocking down the steeple, I agree with you, your

4   Honor.  But I think that the fact of the matter is, we

5   have a case here where it's hard to unravel not just

6   the money but the risk of inconsistent decisions in

7   these arbitration forums -- I don't know how familiar

8   your Honor is with the arbitration of no-fault, that

9   whole -- it's almost a cottage industry in New York.

10  But it's not the same as like a mini-trial arbitration.

11  Most of these arbitrations are conducted often times on

12  the phone.  There's no real rules of evidence, et

13  cetera.

14        As Michael Flaherty, who is the person at

15  Allstate who is the affiant in this case, says in this

16  affidavit, inconsistent results are the norm.  And I

17  think for that reason, Judge Spatt in the Elsinati case

18  -- again, I don't think there's anything meaningful or

19  dispositively meaningful difference between that case

20  and this case.  What my brothers argue here is that the

21  Supreme Court has said the FAA is sort of supreme and

22  we're not going to take away anyone's right to

23  arbitrate.

24        But as Judge Spatt said, it's not -- we're

25  not extinguishing the right, we're simply delaying it

1    in the interest of all parties.  I think that the

2    irreparable harm here is the open question, if you

3    will, your Honor.  I'm not completely set on it one way

4    or the other.  But the open question of what

5    inconsistent results could mean vis a vis estoppel

6    issues, et cetera in the case in this Court.

7               There is no question, as there was no

8    question in Elsinati, that resolution of the issues in

9    this case will likely obviate the need for any

10   arbitration to be conducted at all.  In fact, let's say

11   that my client loses this case and it just gets tossed

12   out on its ear.  My client is not going to go through

13   an arbitration, right?

14              Similarly, if there is a decision made that

15   this is not an entity entitled to take under the no-

16   fault regulatory scheme here in New York, then there's

17   not going to be a basis to arbitrate.  I guess there

18   could still be arguably a basis to arbitrate if there's

19   a finding in this case that there's been medical fraud

20   and maybe there's some other non-overlapping cases in

21   arbitration.  But so your Honor knows, I'm not aware

22   that any of the cases in arbitration presently, which

23   is 35, which is different than when we filed our papers

24   -- those 35 cases are all subsumed in the case at bar.

25              THE COURT:  You said they are?

1          MR. KING:  They are.

2          THE COURT:  What other courts have you

3   sought -- I know Judge Spatt granted the injunction but

4   have there been other courts that have denied it?

5          MR. KING:  No, your Honor.  That was the

6   first time I've done that in the Eastern District.

7   I've only been practicing in the Eastern District since

8   2007.  That was the first time that one of these had

9   been up there.

10          I would say, your Honor, I'm familiar with

11   the arbitration and compelling of arbitration

12   arguments.  There's a case in the Eastern District out

13   of Brooklyn.  It's the Lyons case that's been cited a

14   couple of times.  That was Judge Gleeson in that case.

15   I'm counsel of record in that case.  Clearly, in that

16   case, the issue was, can the defendants compel

17   arbitration.  The judge found in that case -- held that

18   they absolutely did have a right to compel sort of

19   prospective arbitration.

20          That's not what we're talking about here.

21   That's not the same footing or procedural posture where

22   we are here.  There's no other case -- I guess this is

23   the best way to look at it:  I agree with your Honor,

24   the notion that if you're really talking about money

25   damages, well, you can always be satisfied at some

1   point.  I think it's the inconsistent judgment.

2         And I think if you look closely at what

3   Judge Spatt reasoned in that case, that's the only case

4   that I'm aware of -- and I haven't seen one cited by my

5   brothers -- that comes close on the factual scenario in

6   the Eastern District or in the Second Circuit, with

7   respect to this issue.  So I guess it was a very novel

8   issue at that time and I'm not aware of any case

9   where --

10        THE COURT:  They cite this GEICO v. Grand

11   Medical Supply case in the Eastern District on page 8

12   of their opposition.

13        MR. KING:  I think that's the same -- your

14   Honor, with all due respect, that's essentially what I

15   was talking about with the Lyons case because in the

16   GEICO/Grand case, the question was whether or not there

17   could be -- arbitration could be compelled.  The court

18   said, I can't stand in the way of a right of a party to

19   compel.  The Supreme Court says that the FAA is

20   controlling.  There's a lot of discretion in that

21   regard, et cetera.

22        But that's not what this case is about.

23   That's like Lyons.  This case here today, your Honor,

24   this New York Rehab case is like Elsinati.  Judge Spatt

25   in Elsinati said the following:  "While the granting of

```
 1   a motion to compel means the parties are obligated to

 2   arbitrate," -- which we don't disagree with, your

 3   Honor.  We're obligated to arbitrate -- "the court sees

 4   no reasons why the right to an arbitration forum means

 5   that this right must be immediate.  The contractual

 6   agreement to arbitrate can be fulfilled even if it is

 7   deferred in light of the issuance of a temporary stay.

 8   In other words, if an injunction is not permanent, then

 9   it will not eviscerate one's right to compel."

10           That's this case.  I'm not trying to claim

11   ownership of that other case.  I happened to be counsel

12   in that case.  There's no difference.  It was a case

13   where Allstate brought a Malella and medical fraud case

14   under the federal racketeering statute against a group

15   of clinics --

16           THE COURT:  I understand it's similar but I

17   have real reservations about -- just because it delays,

18   that doesn't mean it's inconsistent with the whole

19   purpose of arbitration.  The whole purpose of

20   arbitration is to be efficient, not to have a long

21   delay before the arbitration can go forward.  So I'm

22   not sure I agree with -- we're weighing a lot of

23   different factors here and that one certainly concerns

24   me, given the whole purpose of arbitration to begin

25   with.
```

1              MR. KING:  If I may, your Honor.

2              THE COURT:  Sure.

3              MR. KING:  I understand that that is one of

4    the primary concerns about arbitration; it's quick,

5    it's --

6              THE COURT:  There's two concerns.  One is,

7    we're really just talking about -- we're talking about

8    money.  And then you're pointing out I guess there can

9    be inconsistencies that are generated.  But that has to

10   be balanced against the whole purpose of arbitration.

11   You have defenses in each of those arbitrations in

12   terms of fraud, right?  They're all available to you in

13   each of those.

14             MR. KING:  They are, but at the same time,

15   your Honor, with all respect to the arbitration forums,

16   you can't walk into an arbitration that's going to be

17   conducted twenty minutes on the phone and say, we've

18   got all this evidence and we're going to put on a

19   federal RICO case.

20             I think the interests of efficiency and the

21   fact that the Supreme Court and the Lyons court --

22   Judge Gleeson found, you can compel this arbitration.

23   But there's no -- I don't see anywhere even in dicta

24   where it says that arbitration has to be -- it's a

25   constitutional right to a speedy jury trial.  I don't

1   think that that's the case.

2           I think as Judge Spatt noted, the Second

3   Circuit has carved out that there may be exceptions to

4   this.  Which would seem to me to be an exception

5   because both parties are expending resources on a

6   collateral sort of quasi-judicial litigation of these

7   underlying claims, when the same thing is going to be

8   done in here.

9           I just don't -- forget the money aspect of

10  it.  I think that the inconsistent results is a

11  problem.  And I agree with you, it is a balancing of

12  the equities, but I think the balancing of the equities

13  weights in favor of A) not having everybody spend a lot

14  of time and money on those other issues, which won't be

15  consequential in this case, and more importantly, the

16  time spend in this case, in this Court, will be

17  consequential and dispositive of those claims one way

18  or the other, whether it's beforehand or afer.

19          THE COURT:  But if I were to grant that,

20  Allstate would have the ability to not pay anything out

21  and they would have no recourse.  They couldn't

22  arbitrate it, right?  What recourse would they have?

23          MR. KING:  They can counterclaim.  I mean,

24  they can counterclaim in this Court, right?

25          THE COURT:  Yeah, okay.  Let me hear from

 1   them, okay?  Thank you.

 2          MR. KING:  Sure, thank you.

 3          MR. MURRAY:  This is a 12(b)(6) motion

 4   addressed to the complaint that we have in front of us.

 5   The complaint that we have in front of us -- the only

 6   allegations -- I don't want to be repetitive -- is that

 7   they entered into these two leases and the rental

 8   payments were "excessive."  That's it.  That's all they

 9   have with regard to the Monell claim.

10          They now come up here and make statements

11   about the values of our houses, which I have no idea

12   what he's talking about, talking about the payment of

13   an American Express bill, which I don't have any

14   information about, talking about --

15          THE COURT:  What do you mean, you don't have

16   information about it?  He's claiming you gave him the

17   information.

18          MR. MURRAY:  No.  All I know -- we had a

19   conversation the other day where I got, why do you need

20   the personal American Express of my client?  He says,

21   we have information that they're paying something.  So

22   I didn't give him any information.  This was brought up

23   for the first time Thursday or Friday of last week.  I

24   think it's an acknowledgment that their complaint as

25   pled is deficient.

1          THE COURT:  I don't know about that.  The

2    bottom line is, and you can look at all my decisions,

3    every single one, and it's consistent with the Second

4    Circuit's instruction that if it's a pleading defect

5    for conclusory allegations, then they should be given a

6    chance to amend.  So whether or not the complaint is or

7    is not sufficient at this point, if they say they have

8    additional details, there's no basis for me saying I

9    shouldn't allow them to do that.

10          MR. MURRAY:  I understand that.  I

11    understand that.  And then I would have a chance with

12    the pled complaint to address it and maybe or maybe not

13    make a motion to dismiss with regard to the amended

14    complaint.  But all I have is the complaint that's

15    here.  This is the first time they've mentioned that

16    they want to amend the complaint.

17          I've made a motion to dismiss with regard to

18    the allegations in this complaint.  The allegations in

19    this complaint are completely devoid of any facts which

20    would establish of my client.  The only allegations

21    are, they misquote the content of two leases and say

22    the payments are excessive.  That's it.  If they want

23    to have it dismissed with leave to replead and replead

24    their facts to bolster their claim so I have an

25    opportunity to review that with my client and to

1    address it in an appropriate manner, I would do that.

2    But what I have now -- all I can argue is what I have

3    and what they've pled.

4           They're pleading was just -- slap something

5    together, serve it on us, drag us in and go through

6    this motion.  They could have amended the complaint

7    prior to us making a motion.  I've seen that happen in

8    the courts, where they say --

9           THE COURT:  But as you can see, their

10   argument is that they're getting information -- since

11   they filed this complaint, that they have additional

12   information.

13          MR. MURRAY:  Then plead it and then I can

14   address it.  I can't be ambushed during a hearing.

15          THE COURT:  I understand that.  I understand

16   that.

17          MR. MURRAY:  And making statements that I

18   have no idea whether they're true or not true or what

19   the basis of it is.  So I think looking at this

20   complaint, looking at the allegations of this

21   complaint, they're deficient as to the leasing

22   defendants.  They do not plead a plausible RICO claim

23   against my defendants based on two leases that they

24   misquote, and they made a conclusory statement that the

25   payments are excessive.  That's it.  The only

1   paragraphs dealing with my client are 57 to 73.  Those

2   are the only ones that have any facts whatsoever with

3   regard to my clients.  That's it.

4           He also makes the statement that we've pled

5   that they've conspired, all the defendants have

6   conspired.  They haven't pled anything for conspiracy.

7   There's not an allegation of a meeting, there's no

8   allegations of an agreement.  There's no allegations of

9   communications.  They have an obligation under Iqbal to

10  set forth facts in a complaint that we can address, and

11  they haven't done that.

12          Everything that they're throwing up now at

13  the last minute is not properly before the Court and if

14  the Court grants them leave to replead, they can

15  replead and we can address it at that time.

16          THE COURT:  Okay.

17          MR. MURRAY:  With regard to the injunction,

18  funny, they rely on Judge Spatt's determination in

19  Elsinati.  Judge Spatt also said in that case, "It is

20  no doubt unwise for a court to simply step in and stay

21  a contractually deserved arbitration merely because the

22  court sees potentially more efficient use of time and

23  resources by litigants, arbitrators and judges."

24          He then goes on to actually grant a

25  temporary stay of it because the defendants in that

1    case had asserted counterclaims for the same claims

2    that were going into arbitration.  There's been no

3    counterclaims asserted in this case for those claims

4    that are before arbitrations.  There's no counterclaims

5    at all at this point in this proceeding.

6            Second of all, there is the Federal

7    Arbitration Act, which the court -- both the Second

8    Circuit and the Eastern District in Grand Medical said,

9    you can't stay arbitrations that are contractually

10   bound under the Federal Arbitration Act.  Regardless of

11   the fact if there's issues with regard to res judicata

12   or collateral estoppel and the effect on other

13   litigation in federal court, they will have to be

14   addressed.

15           But you can't sit there and deny a person,

16   as the court indicated, that we have a contractual

17   right spelled out in the statute, New York Rehab, to

18   pursue the claims in a timely manner.  They have not

19   alleged any irreparable harm or any 36-billion-dollar

20   company -- that 70 claims of $1,000 is somehow going to

21   put them out of business.  So I don't think they've

22   come even close to alleging any of the elements of an

23   injunction.

24           THE COURT:  Okay.

25           MR. LICATESI:  I was kind of scratching my

1   head, how they know exactly where my client lives,

2   which is in Monsey.  He's a religious Jew.  And they

3   know where codefendants live, on the North Shore of

4   Long Island.  But they didn't have the lease agreement

5   or the knowledge of the contents of that lease

6   agreement in court today on a motion to dismiss, which

7   they base their pleading, which has turned my client's

8   life upside down.

9           They want to take that noose and make it

10  tighter by asking this Court to deprive my client his

11  right to go into an arbitration proceeding and rectify

12  the wrongful conduct of Allstate in a proceeding that's

13  the most efficient, expeditious and most qualified

14  forum for that particular claim.  I'll share with the

15  arbitrators next time I see them what Smith & Brink

16  thinks, but the problem here is that once again,

17  they've mischaracterized the whole process.

18          You see, I teach the CLE courses on no-fault

19  regulations.  I attend those arbitrations regularly.

20  And 98% to 99% of them are in person, and we do argue

21  exactly what Smith & Brink has once again

22  misrepresented to this Court, that we haven't addressed

23  the no-fault scheduling of the bills, the mail fraud

24  they're alleging, the medically unnecessary services.

25  I argued ten of those cases this week and it's the

1    arbitrator that decides the medical necessity.

2            The allegations contained in that complaint,

3    your Honor, that say an EMG should be done maybe not

4    bilaterally, maybe you should do four nerves and two

5    motors.  Those are arguments that are made 100 times a

6    day before about 150 arbitrators.  Most of those

7    decisions are pretty consistent, and they're not done

8    on the telephone.

9            <u>Malella</u> allegations are addressed routinely

10   for demands for examinations under oath of healthcare

11   providers, and they're done by the experts in this

12   field, which really are those arbitrators.  That's why

13   the system was put in place.

14           In one breath -- and this is an important

15   point, your Honor, and I didn't make it previously.

16   They say that each claim should be addressed

17   individually.  That's what they're contractually

18   obligated to do through their insurance agreements.

19   That's what the law says that they have to do.  But

20   then they want to lump all those claims together and

21   have this Court address them, which is patently

22   improper.  They're attempting to disguise the issue of

23   medical necessity and fee scheduling as a RICO case,

24   and it's not.  And we address that issue, although they

25   feel that we didn't address it.

1            Most disturbing to me, your Honor, is the

2    subpoenas.  Last month, we were asked if we would

3    consent to an adjournment of this oral argument, and I

4    was misled.  I was told that there were scheduling

5    problems and they just couldn't be here, and would I

6    consent to it?  As a professional courtesy, because

7    I've never said no in 27 years -- what happened in the

8    last three to four weeks was the filing of all these

9    subpoenas.

10            We immediately made a motion to quash and

11    the magistrate said, listen, you have to have a meet

12    and confer on this.  And when we tried to do that --

13    and I can show you the e-mails -- we were rebuffed and

14    we were told why, these issues can't be resolved.  We

15    said, well, we have to do that because we need to make

16    this motion to quash.

17            We sent letters out to those parties and

18    said to them, we're litigating this issue, we have a

19    motion to quash, please don't comply.  And what they

20    did during that time was, they continued to harass

21    those subpoenaed parties and did end up getting some of

22    those records, so that they could come here today and

23    try to impress this Court with facts that are not in

24    the pleadings and which are completely irrelevant, and

25    even if they replead this pleading, we're going to show

1   that they're just going on a fishing expedition and

2   taking facts and trying to contort them, just like they

3   did with the lease agreements.

4           THE COURT:  I don't understand.  I agree

5   with Mr. Murray.  I'm not going to decide that issue

6   now.  But certainly, if they were to add all these

7   other facts, it would be a totally different ball game.

8   That one of the leasing defendants is representing

9   herself as the healthcare administrator, that $500,000

10  went from New York Rehab to them through Amex.  Those

11  are significant allegations.  Those aren't like minor

12  tweaking of the -- those are significant allegations,

13  right?

14          MR. LICATESI:  Your Honor, I couldn't

15  disagree with that but --

16          THE COURT:  Okay, so when you say, we're

17  going to shoot those down, I don't --

18          MR. LICATESI:  I couldn't put those in my

19  motion to dismiss because they're not before us.

20          THE COURT:  I understand but if they allege

21  those things, you say, I'm going to shoot them down.

22  But, again, it's a motion to dismiss.  Even if you

23  believe that they're wrong, if they allege those types

24  of things, those are serious, non-conclusory

25  allegations with respect to the relationship between

 1    the defendants and the entity.

 2            MR. LICATESI:  Judge, there's a New York

 3    State PJI charge that says that when somebody

 4    misrepresents one thing, you can disregard the totality

 5    of what they're representing.  So far today, we've

 6    shown their misrepresentations in terms of what they

 7    brought to this Court, and we'll continue to point out

 8    out to the Court.  Under the 12(b) motion to dismiss,

 9    we wanted to point out the misrepresentations.

10            With respect to Pacific Indemnity, your

11    Honor, they do have to make a showing of that

12    irreparable harm.  This is a company, an entity that in

13    2009 had a 32-billion-dollar revenue and over the last

14    four quarters, over 34 billion dollars in revenue.  Do

15    we think that the payment of certain claims right now

16    that average less than $1,000 are going to cause

17    Allstate irreparable harm, or would they hurt the

18    healthcare practitioner who is struggling to make a

19    living?  That's the question I leave you with, Judge.

20            THE COURT:  Okay, thank you.

21            First of all, I'm going to rule on the

22    preliminary injunction motion on the record now.  I'm

23    going to deny that motion.  The standard for

24    preliminary injunction is well-settled.  The movant

25    must demonstrate, one, irreparable harm absent

1   injunctive relief, and two, either a likelihood of

2   success on the merits or a serious question going to

3   the merits to make them a fair ground for trial, with

4   the balance of hardships to be decidedly in the

5   plaintiffs' favor.

6          The irreparable harm requirement is not met

7   in this case.  We are dealing with money damages.  All

8   the things that we've discussed that are in the

9   complaint can all be compensated through money damages.

10  To the extent that the irreparable harm articulated is

11  inconsistent -- potential inconsistent results in

12  various arbitration proceedings, I do not believe under

13  the circumstances of this case that that possibility is

14  sufficient to constitute irreparable harm in terms of

15  the issuance of an injunction.

16         In terms of likelihood of success on the

17  merits, I don't believe I have sufficient basis to

18  conclude that requirement at this point.  And as to the

19  issue of serious questions going to the merits to make

20  them a fair ground for trial, assuming that is

21  satisfied here, the balance of hardships I do not think

22  tips decidedly in the plaintiffs' favor, again, when

23  you balance the inconsistent results versus the purpose

24  of arbitration, the contractually agreed-upon

25  arbitration and the substantial delay that would ensue

1    in that arbitration if the Court were to issue this

2    injunction.  So under the circumstances of this case,

3    I'm denying the injunction.

4             With respect to the motion to dismiss, the

5    Court in its discretion does not have to decide a

6    pending motion to dismiss before giving leave to amend.

7    A request has been made to amend.  As I said, if I were

8    to dismiss the complaint, as a matter of course, I

9    would give them an opportunity to replead.  But there's

10   no requirement that I go through that exercise of

11   analyzing a complaint that they've already decided --

12   they've already told me that they have additional facts

13   that can make some of the issues that we talk about

14   academic in terms of conclusory allegations and things

15   like that.

16             So in my discretion, I'm going to allow them

17   to amend the complaint before I decide and to save

18   costs to the defendants -- I don't want you to have to

19   put in whole new sets of briefs.  So if you believe,

20   which I assume you'll continue to believe that the

21   complaint is defective, you can just put in -- we'll

22   set dates but you can just put in a letter saying, we

23   renew our motion, and then just in the letter -- you

24   don't have to go through all the law again.  You can

25   just state why whatever additional allegations they put

```
 1   in you believe still or conclusory or insufficient in
 2   some way.  Then I'll consider your prior briefs in
 3   conjunction with those letters.  I won't have oral
 4   argument again unless I have any questions based upon
 5   the letters that were filed, okay?
 6               MR. KING:  Your Honor?
 7               THE COURT:  Yes.
 8               MR. KING:  There has been an issue with
 9   regard to discovery and the magistrate had basically
10   pushed back our obligation to respond to discovery
11   until after today's date.
12               THE COURT:  Okay.
13               MR. KING:  Is this an issue that we should
14   address with the magistrate now, whether or not --
15               THE COURT:  Yeah, you can address it with
16   the magistrate but I want you to know -- we'll set some
17   dates.  I don't intend this to be like thirty/thirty.
18   I expect weeks we're talking about, and my expectation
19   would be to decide this very quickly once I get those
20   supplemental -- once I get the amended complaint and
21   the letters, my intention would be to decide it within
22   two weeks of that date, so that the parties can figure
23   out what to do, okay?
24               MR. KING:  Okay, thank you.
25               MR. LICATESI:  Your Honor, what about the
```

1   motion to quash the subpoenas?

2           THE COURT:  You've got to address that to

3   the magistrate judge.  I thought Mr. Murray told me

4   that that was being held in abeyance pending this,

5   right?

6           MR. MURRAY:  The discovery, but we'll

7   address it with the magistrate.

8           THE COURT:  I'm not going to get involved in

9   that.

10          MR. LICATESI:  I understand that, your

11  Honor, but they're busy calling up these subpoenaed

12  parties and trying to get records before we even go

13  before the magistrate, because we just conferred and

14  while we're conferring, they're doing things behind our

15  -- it's not a level playing field.

16          MR. KING:  Your Honor, may I just -- it's

17  rare that I'm in federal court and someone I've never

18  met calls me a misrepresenter time and time again.  I

19  guess it's going to be personal.  Your Honor, it is a

20  matter for the magistrate.

21          The fact of the matter is, the reason that

22  these guys' motion to quash didn't get before the

23  magistrate is because -- he's been before the

24  magistrate in this case, I hadn't been.  My associate

25  was.  He didn't follow her rules.  That's the only

```
 1   reason the motion to quash didn't happen.

 2              When I spoke to these two fellows two weeks

 3   ago, I told them as a matter of good faith, if you want

 4   to bring it up to the judge, I would agree to have the

 5   oral argument there.  I don't even need your papers.

 6   We'll argue the issues.  They still haven't filed the

 7   papers.  So this sort of vitriol about Allstate and how

 8   much money it makes every year, it's irrelevant and

 9   it's offensive.

10              THE COURT:  Okay.  I don't want to get

11   involved in that.  You can --

12              MR. KING:  My only question is, can we have

13   thirty days to file our papers?

14              THE COURT:  Thirty days?  That's a long

15   time.

16              MR. KING:  Twenty days?

17              THE COURT:  Twenty days.  I was thinking

18   more along twenty days, okay?

19              MR. KING:  Thank you.

20              THE COURT:  Say April 22nd.  Then how long do

21   you want to put in your letter renewing --

22              MR. MURRAY:  The only problem is I'm going

23   to be away the first week of May, so if I could have

24   twenty days.

25              THE COURT:  That's fine, May 12th, okay?
```

1          I'll give you until May 30th then to oppose

2    that.

3          MR. KING:  Sure.

4          THE COURT:  Then the reply by June 9th.

5    Again, don't rehash all the other arguments.  This is

6    just on this issue of the specificity as it relates to

7    the principals and whether or not -- the ownership

8    issue, okay?  And I won't have oral argument.  My

9    intention would be either to issue an oral ruling or a

10   written ruling before June 30th, okay?

11         MR. MURRAY:  Excellent.  Thank you, your

12   Honor.

13         THE COURT:  Okay, thank you.  Have a good

14   night.

15              * * * * * * * *

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON             April 11, 2014